UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CARMELO VATICANO, | : | |
| | : | Civil Action No. 09-01751 (SDW)(MCA) |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| TOWNSHIP OF EDISON, MAYOR JUN | : | |
| H. CHOI,  BRIAN COLLIER, and | : | November 5 , 2010 |
| THOMAS BRYAN, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

**WIGENTON**, District Judge.

Before the Court is a Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c).  Defendants Township of Edison, Mayor Jun H. Choi, Brian Collier and Thomas Bryan (collectively "Defendants") move for summary judgment on Plaintiff Carmelo Vaticano's ("Vaticano" or "Plaintiff") 42 U.S.C. § 1983 and age discrimination claims.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  This motion is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons below, this Court grants Defendants' Motion for Partial Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Vaticano, a deputy chief of police, was sixty years old at the time this suit was initiated and had been employed by the Township of Edison (the "Township") since December 28, 1997. (Compl. ¶¶ 9, 14, 16.)  Plaintiff alleges that he was not promoted to the position of chief of police because he publicly supported George Spadoro ("Spadoro"), one of Jun Choi's ("Choi")

1

opponents in the 2005 primary election and the 2006 general election, (Compl. ¶¶ 17-18), and because he provided a sworn statement in support of plaintiff Edward Wheeler ("Wheeler") in Wheeler v. Twp. of Edison, 2008 U.S. Dist. LEXIS 31206 (DMC) (D.N.J. Apr. 15, 2008), aff'd, 2009 U.S. App. LEXIS 8940 (3d Cir. Apr. 17, 2009) (the "Wheeler action").  (Compl. ¶ 26.) Additionally, Plaintiff maintains Defendants retaliated against him by assigning him to work midnight shifts for two weeks, "removing responsibilities from him and other acts of retaliation." (Compl. ¶ 52.)  Moreover, Plaintiff alleges that he was discriminated against on the basis of his age.  (Id.)

In 2005, Choi ran for mayor against Spadoro in the Democratic primary election. (Compl. ¶ 17.)   Plaintiff maintains he supported and contributed to Spadoro's campaign. (Compl. ¶ 18.)  In 2006, Choi won the mayoral election and became the Township's mayor. (Compl. ¶ 19.)  In May 2007, several candidates for the Township's council were campaigning at a "Family Day Event" ("the Event") at the Raritan Center ("the Center").  (Compl. ¶ 21.)  During the campaigning, Plaintiff received a complaint from another candidate that unauthorized people were campaigning at the Event.   (Pl.'s Br. Ex. 8 at 1.)   Believing that the campaign was occurring inside the Center, Vaticano ordered an officer to disperse the crowd.  (Id.)  However, the campaign was actually taking place outside the Center.  (Id.)  After discovering that Plaintiff ordered the campaigners to cease, Choi allegedly called Plaintiff and told him that the campaign was outside the Center and that the participants had a right to be there.  (Id.)  Choi further allegedly stated that he was "tired of [] [Plaintiff] politicizing the police department," and that he would "write . . . [Plaintiff] up" if he did not order the officers to stop.  (Id.)  Consequently, Plaintiff did not take any further action with regard to the campaigners.

Subsequently, the Township's council, by a majority vote, made changes to the police department's rules and regulations.  (Defs.' Statement of Facts ¶¶ 106, 107, 110.)  Of particular significance were the changes made to the ordinance pertaining to the promotion of the deputy chief and the chief of police.   Prior to its amendment, Section 2.96.460, provided: "[a]ny individual, officer or candidate to be promoted to the position of chief of police or deputy chief shall have served in the position of captain of the police department for a term of no less than two years."  (Pl.'s Br. Ex. 12 at 99.)  However, on March 31, 2008, the ordinance was amended to allow the promotion of a lieutenant to deputy chief or chief without requiring the candidate to serve as captain for two years.  (Compl. ¶ 27.)

On April 1, 2008, Choi appointed Brian Collier ("Collier"), a civilian, as Director of the Edison Police Department ("Director").  (Defs.' Statement of Facts ¶ 12.)  Prior to Collier's appointment, Choi also served as the Director of Public Safety and had the authority to make promotional decisions in that capacity.  (Id. at ¶ 18.)  However, Choi relinquished this position to Collier after he was appointed Director.[1]   During that same time, Thomas Bryan ("Bryan"), previously a lieutenant and commander of the Internal Affairs Unit, (Id. at ¶ 14),[2] was promoted to deputy chief of police.  (Id. at ¶ 13.)  Collier and Bryan did not support Choi in his bid for mayor.  (Id. at ¶ 19.)  In fact, Bryan asserts he supported Spadoro by attending his fundraisers and displaying his sign in his local store.  (Id. at ¶ 20; Defs.' Br. Ex. F, Bryan Dep., 18:5-20.)  At the time of these appointments, a chief of police had not yet been selected.[3]  (Defs.' Statement of Facts ¶ 13.)  Consequently, in April 2008, Collier gave Bryan "operational authority of the police

---

[1] Choi states that one of the reasons he relinquished the position to Collier was that he did not want to continue the practice of his predecessors promoting individuals within the police department for political reasons. (Pl.'s Br. Ex. 10, Choi Dep., 27:21-25, 28:1-25.)
[2] There is no doubt that Bryan's promotion to deputy chief would have been a violation of the ordinance under the previous version of Section 2.96.460, as Bryan had not served as captain for two years.
[3] Ron Gerber ("Gerber") was the acting chief of police but his retirement left the position vacant.

department," although Plaintiff's expert report states Plaintiff "was more qualified than Thomas Bryan in all areas to be the higher ranking [d]eputy [c]hief in [c]harge." (<u>Id.</u> at ¶ 13; Pl.'s Br. Exs. 2, 7.)

At the time of Bryan's promotion, some of the problems identified within the department included: "[l]ack of accountability," and instances of police officers breaking the law. (Defs.' Br. Ex. E, Choi Dep., 24:20-21.) For example, a police officer raped a female resident, another robbed a bank, and another fled the scene of an accident and attempted to have his commanding officers cover it up. (<u>Id.</u> at 24:22-25, 25:1-3.) These problems were echoed in a report prepared by the Division of Local Government Services in 2007 ("the DLGS report") which identified the police department "as a Department in crisis" and noted that there was "strong public criticism and editorials that labeled the Department with the perception of being a 'bully like' group or involved in cover-ups." (Pl.'s Br. Ex. 11 at 17, 18.)

Because of these problems, Collier stated that he "needed someone who would follow [his] lead to try to take the police department forward." (Defs.' Br. Ex. Q, Collier Dep., 62:21-22.) Collier asserts that he picked Bryan over Plaintiff because he "believed that" Bryan "was the best person to lead the department forward." (<u>Id.</u> at 60:4-7.) According to Collier, the neglected nature of the department did not give him confidence in Plaintiff's leadership. For instance, Collier maintains "[t]he furniture was chipped, broken, wobbly, dangerous, secondhand and . . . [P]laintiff had evidently done absolutely nothing to take care of the staff. At the same time I took a look at the very luxuriously-appointed office of the [P]laintiff and it was my opinion that he was very much concerned with himself . . . ." (<u>Id.</u> at 60:15-22.) Collier also added:

> [b]ased upon all of my research which included a number of
> people with knowledge of Edison and its police department as well

> as other police departments and other law enforcement agencies
> and based upon some anecdotal observations . . . as well as what I
> considered based upon my research an integrity deficit within the
> department it was my opinion that the staff and the leaders who
> had been there were not going to move the police department
> forward . . . .

(Id. at 62:11-22.)  Collier also believed Plaintiff had not exhibited good leadership in his role as

deputy chief.  According to Collier,

> [Plaintiff] had been there in a leading role in the police department
> and yet as I mentioned the place was absolutely neglected and I
> cited the example of the furniture.  I can cite the example of the
> interview room where there is a mirror installed backwards and
> never changed and never fixed. . . . I basically left it there as a
> monument to the amount of neglect that this department suffered
> over the years and obviously its officers suffered the same neglect
> and I did not want to continue with what I in my opinion perceived
> as failed leadership.

(Defs.' Statement of Facts ¶ 112.)  Collier's perceptions are consistent with the DLGS report,

which notes that the problems in the department had "never been addressed at any command or

first line supervisory level."  (Pl.'s Br. Ex. 11 at 17.)

Nevertheless, Plaintiff alleges he was not given operational authority because he publicly

supported Spadoro and provided a certification in support of Wheeler in his action against Choi.

In addition to being skipped over, Plaintiff alleges Defendants engaged in other retaliatory acts in

assigning him tasks usually delegated to lower ranked officers.  (Compl. ¶¶ 31-45.)  In particular,

Plaintiff complains of four assignments.  First, in May 2008, Bryan assigned Plaintiff to research

the COMPSTAT program with the Newark Police Department for sixty days.[4]  (Compl. ¶ 31.)

However, Bryan maintains that he chose Plaintiff to participate in that research because "it was

[his] intent to put command leadership up there."  (Defs.' Br. Ex. F, Bryan Dep., 33:20-21.)

---

[4] Plaintiff states in his complaint that the assignment lasted for sixty days, but Bryan indicates that it only lasted for
six weeks.  (Compl. ¶ 31; Defs.' Br. Ex. F, Bryan Dep., 34:17.)  In any event, the assignment was originally
intended to last for thirty days but it lasted longer because Plaintiff took a vacation during the course of the
assignment.  (Defs.' Br. Ex. F, Bryan Dep., 34:13-17, 87:22-25.)

Moreover, Bryan maintains that he chose Plaintiff because the "point of contact" for the program was a deputy chief as well; therefore, it would be "deputy chief to deputy chief." (Id. at 33:25; Defs.' Br. Ex. Q, Collier Dep., 77:1-4.)

Second, Plaintiff alleges that in July 2008, he "and other similarly situated individuals were assigned to work the midnight shift to embarrass them . . . ." (Compl. ¶ 32.) On the other hand, Bryan asserts Plaintiff's assignment to the midnight shift was in response to "a lack of supervision especially from the frontline supervisors" which resulted in two incidents of "intolerable behavior." (Defs.' Br. Ex. F, Bryan Dep., 63:12-64:4.) In the first incident, a police officer "jacked up one of the other officer's cars and put it on four blocks." (Id. at 63:17-18.) In another incident, two officers from the midnight tour were rumored to have stolen a police vehicle leading to the involvement of Homeland Security, the prosecutor's office, and the joint terrorism task force. (Id. at 63:19-24.)

Third, Plaintiff maintains that his assignment to the Communications Bureau (the "Bureau") on September 16, 2008, was also retaliatory. (Compl. ¶ 35.) However, when Plaintiff was initially approached about this assignment he was enthusiastic and indicated that it was "not a problem." (Defs.' Br. Ex. B, Vaticano Dep., 150:11-16.) Bryan maintains that Plaintiff's assignment was part of an effort to implement new initiatives within the Bureau. (Defs. Br. Ex. F, Bryan Dep., 70:24-71:7.) According to Bryan, he believed a command staff was needed for the assignment because there had been "numerous occasions where dispatchers had given the wrong information" and the captain assigned to the Bureau was unable to effectively manage it. (Id. at 70:20-25.) With respect to Plaintiff's office being moved to the ground floor, Bryan states that the office was newly renovated and the move was necessary since the Bureau was located on

the same floor and the captain who had previously managed it had his office on the ground floor. (<u>Id.</u> at 72:1-18, 86:1-4.)

Finally, Plaintiff asserts that he was assigned to manage the Township's car impound lot in 2008, a responsibility usually given to a sergeant of police. (Compl. ¶ 41.) According to Collier, the impound lot "was another area of absolute neglect," (Defs.' Br. Ex. Q, Collier Dep., 124:6), because there were about 350 cars in the lot, with some being there since 1996. (<u>Id.</u> at 124:7-9.) Within a year of Plaintiff's assignment to the impound lot, about 300 cars were sold and the Township generated about $100,000 in revenue. (<u>Id.</u> at 124:13-15.)

In the interim, Collier evaluated Plaintiff and Bryan's performance. On August 27, 2008, Collier emailed Plaintiff his performance evaluation. (Defs.' Br. Ex. R.) In that email, Collier noted that Plaintiff's report on the COMPSTAT program was "remarkably unimpressive . . . shallow and rudimentary, mostly a collection of pre-printed hand-outs." (<u>Id.</u>) On Plaintiff's assignment to the midnight shift, Collier stated: "[a]sked to make a sacrifice to assist the PD in analyzing night operations after an unfortunate incident, you did so begrudgingly . . . [y]our subsequent reporting on night operations duplicated the style you adapted in Newark, shallow and rudimentary." (<u>Id.</u>) Furthermore, Collier stated: "your record to date can be summed up simply. You are underperforming." (<u>Id.</u>) In contrast, Collier's email to Bryan on August 29, 2008, noted that although Bryan had difficulty delegating assignments his "performance [wa]s satisfactory and that he had "done [his] best and accomplished most of what [he] had set out to do." (Defs.' Br. Ex. S.) Plaintiff acknowledges that by this time he and Collier "just did not have a working relationship." (Defs.' Br. Ex. B, Vaticano Dep., 149:23-24.)

On January 13, 2009, Collier promoted Bryan to chief of police despite Plaintiff's seniority. (Defs.' Statement of Facts ¶ 15.) According to Collier, his decision was based on his

opinions and observations, as well as the opinions of other individuals within the police department.  (Defs.' Br. Ex. Q, Collier Dep., 125:2-19.)  However, Plaintiff asserts that this was yet another retaliatory act.

Consequently, Plaintiff initiated this action and filed his complaint on April 14, 2009, seeking damages, promotion to chief of police, injunctive relief and attorney's fees for retaliation and age discrimination in violation of (1) 42 U.S.C. § 1983 and (2) N.J. Stat. Ann. 40A:14-179 (West 2010).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law . . . ."  Id. at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).  Once the moving party

meets its initial burden, the burden then shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculation, unsupported assertions or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001); see also Celotex, 477 U.S. at 324.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crafting Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

## DISCUSSION

Defendants move for partial summary judgment on Vaticano's claims for retaliation, age discrimination, and due process violation.  Defendants maintain that Plaintiff has failed to show that he was retaliated against for exercising his first amendment rights.  Moreover, Defendants argue that Plaintiff cannot establish that his due process rights have been violated.  Finally, Defendants assert that Plaintiff's claim of age discrimination is not supported by the facts. Plaintiff argues that summary judgment should not be granted because he has presented genuine issues of material fact on all of his claims.

### I.   Retaliation

In order to succeed under a First Amendment retaliation claim, Plaintiff has the initial burden of showing "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."   Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006) (citing Mitchell v. Horn, 318 F.3d 523,

530 (3d Cir. 2003)).  Thereafter, the burden shifts to the Defendant to show, by a preponderance of the evidence, "that the same action would have been taken even in the absence of the protected conduct."  Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir. 1983); see also Swineford v. Snyder Cnty., 15 F.3d 1258, 1270 (3d Cir. 1994).

### A.  Petitions Clause Violation

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peacefully to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  In cases where the plaintiff is alleging that retaliation is in response to expressive conduct such as speech, the employee is not immune from retaliation unless the speech touches on a matter of public concern.  Ivan v. Cnty. of Middlesex, 595 F. Supp. 2d 425, 468 (D.N.J. 2009); see also San Filippo v. Bongiovanni, 30 F.3d 424, 434 (3d Cir. 1994).  On the other hand, if the expressive conduct involves the "filing of a lawsuit or grievance, the petition clause is implicated" and the suit need not implicate a matter of public concern so long as it is not a sham.  Ivan, 595 F. Supp. 2d at 468.

In this case, Plaintiff alleges Defendants retaliated against him for filing a certification in support of the plaintiff in the Wheeler action.  (Compl. ¶ 47.) [5]  "The right to participate as a party to litigation seeking to remedy an infringement of constitutionally-guaranteed or other legal rights has traditionally been considered an aspect of the freedom to petition the government for a redress of grievances protected by the First Amendment."  Pollock v. City of Ocean City, 968 F. Supp. 187, 191-92 (D.N.J. 1997).  Therefore, an employee's participation in a legal proceeding as a party or a witness is protected by the Petitions Clause.  Id. at 192.  In addition to lawsuits,

---

[5] Because Plaintiff is alleging that Defendant's actions were in violation of the Petitions Clause, there need not be a discussion on whether the Wheeler action implicated a matter of public concern.

EEOC claims, workers compensation claims, and letters are examples of formal and informal petitions protected under the Petitions Clause.  Foraker v. Chaffinch, 501 F.3d 231, 236- 37 (3d Cir. 2007); see also San Filippo, 30 F.3d at 440 n.18.  Here, however, Plaintiff's filing of a certification in another individual's lawsuit does not fall under the Petitions Clause.  Plaintiff was not a party in the Wheeler action.  Additionally, the mere act of filing a certification does not make Plaintiff a witness.  Also, the filing of a certification does not qualify as filing a petition or grievance against the government.  Therefore, Plaintiff's conduct does not fall within the Petitions Clause.

In any event, even if Plaintiff's filing of the certification is considered a constitutionally protected activity, he fails to show a "causal link" between his certification and the alleged retaliatory conduct.  A causal link can be established by showing "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).  If the plaintiff is unable to show either, he/she must demonstrate that "from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation."  Id.

In order for Plaintiff to have a valid claim under the Petitions Clause, he must show that Defendants were aware that he filed a certification in the Wheeler action.  However, other than Plaintiff's bare assertion that Choi's attorney would have shown Choi the certification, he has not provided any evidence to show that any of the Defendants were actually aware that he filed a certification in the Wheeler action.  Choi's lead attorney in the Wheeler action, Eric Harrison, certified that he "never sent a copy or communicated the existence of [d]eputy [c]hief Vaticano's Certification in the Wheeler case to either Mayor Choi or any other person associated with the

Township of Edison" because he "found the contents of the Certification to be immaterial to Sergeant Wheeler's claims and our defenses." (Defs.' Br. Ex. Y ¶¶ 4-5.) Richard Flaum, another attorney for the Defendants in the Wheeler action, also certified that he "did not advise Mayor Choi or any other individual associated with the Township of Edison that [d]eputy [c]hief Vaticano had provided such an affidavit." (Flaum Aff. ¶ 4.) Plaintiff has failed to provide any evidence that would counter these statements. Hence, Plaintiff has failed to show that there is a causal link between his certification and the alleged retaliatory conduct.

Furthermore, Defendants have presented enough evidence to show that those alleged retaliatory decisions would have been made even if Plaintiff had not engaged in the protected activity. With respect to Bryan's promotion to deputy chief and Collier's decision to give him "operational authority," the record is replete with evidence indicating that Collier was not satisfied with Plaintiff's work performance. (See Defs.' Br. Ex. R.) Additionally, Collier asserts that he did not believe Plaintiff had the skills necessary to lead the department. Also, Plaintiff does not provide any evidence to contradict Collier's assertions.

Nonetheless, Plaintiff's expert report states that Plaintiff was better qualified because of his credentials and seniority. (Pl.'s Br. Ex. 2 at 7.) Although Plaintiff has more seniority and experience, his expert's report fails to acknowledge Collier's concerns about Plaintiff's ability to lead and his evaluation of Plaintiff's work performance. Collier stated that in making his decision, he focused on the department's needs, and the competence and leadership abilities of Bryan and Vaticano. Therefore, even if Plaintiff's expert's conclusion is accepted as true, it is not sufficient to create a genuine issue of material fact because it does not address Plaintiff's alleged shortcomings.

**B.  Right to Free Speech**

A public employee's speech is protected when "(1) the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).  After the employee makes this showing, the burden shifts to the employer to prove the "allegedly retaliatory action would have been taken absent the protected conduct." Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006).  Plaintiff contends Defendants retaliated against him for filing a certification in the Wheeler action and for challenging Choi's experience at a Democratic Club meeting.[6]  (Pl.'s Opp. Br. 14.)

With regard to Plaintiff's certification in the Wheeler action, Defendants concede that Plaintiff was not acting in his official capacity.  (Defs.' Br. 8.)  Therefore, the first prong has been satisfied.  The next inquiry is whether Plaintiff's speech implicated a matter of public concern.  Speech implicates a matter of public concern "if it can 'be fairly considered as relating to any matter of political, or social, or other concern to the community." Green v. Phila. Hous. Auth., 105 F.3d 882, 885-86 (3d Cir. 1997) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).  In deciding this issue, the Court must "focus on the content, form, and context of the activity in question." Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001).  Similar to Vaticano, the plaintiff in the Wheeler action alleged that Choi made promotional decisions based

---

[6] This is the first time Plaintiff alleges Defendants retaliated against him based on his speech challenging Choi's experience in 2005.  In his complaint Plaintiff only alleges that he was retaliated against because he filed a certification in the Wheeler action.  (See Compl. ¶¶ 46-51.)

on political considerations.  <u>Wheeler</u>, 2008 U.S. Dist. LEXIS, * at 2.[7]  In Vaticano's certification

he asserted that he reviewed the files of the candidates for captain and lieutenant, (Defs.' Br. Ex.

G. ¶ 5), and that Choi's assertion that he collaborated with the commanders about who to

promote and the nature of the assignment to be given was false.  (<u>Id.</u> at ¶ 6.)  Here, Plaintiff's

speech implicated a matter of public concern because it dealt with the allegedly improper manner

in which Choi promoted officers; thus, it sought "to bring to light actual or potential wrongdoing

or breach of public trust on the part of [a] government official[]."  <u>Baldassare</u>, 250 F.3d at 195

(quoting <u>Holder v. City of Allentown</u>, 987 F.2d 188, 195 (3d Cir. 1993) (internal quotation

omitted).  However, like Plaintiff's Petition Clause claim, Plaintiff is unable to show that Choi

was aware that he filed a certification.  As such, he is unable to satisfy the third prong of the test.

Similarly, Plaintiff fails to show a connection between his speech at the Democratic club meeting

and Defendants' subsequent employment decision.

   Moreover, Defendants have provided evidence showing that Plaintiff would not have

been promoted to chief of police even if he had not filed a certification in the Wheeler action or

questioned Choi's experience.  For example, the record shows that Collier had legitimate

concerns about Plaintiff's ability to lead the department and found Plaintiff's work

unsatisfactory.  Furthermore, Plaintiff admits he did not have a good working relationship with

Collier.  Therefore, even if Plaintiff could meet his burden, Defendant has demonstrated that he

would not have been promoted, regardless of his participation in the Wheeler action.

### C.  Political Association

   Although political patronage has been identified as a practice "as old as the American

Republic," <u>Boyle v. Cnty. of Allegheny Pa.</u>, 139 F.3d 386, 394 (3d Cir. 1998), the Supreme

---

[7] However, unlike Plaintiff, Wheeler did not allege that he was not promoted because he supported another Choi opponent, Bill Stephens, in the mayoral elections.  <u>Wheeler</u>, 2008 U.S. Dist. LEXIS, * at 16.

Court has limited its use and emphasized that "[t]o the victor belong only those spoils that may be constitutionally attained."   Rutan v. Republican Party of Ill., 497 U.S. 62, 64 (1990). Therefore, in Elrod v. Burns, 427 U.S. 347 (1976) and Branti v. Finkel, 445 U.S. 507 (1980), the Supreme Court held that "termination of public employees because of their political affiliation violates the First Amendment unless the position at issue involves policymaking." Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007).   Subsequently, the Third Circuit enunciated a three prong test to establish a claim of discrimination based on political patronage: the plaintiff must show that "(1) [he/]she was employed at a public agency in a position that does not require political affiliation, (2) [he/]she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." Id. at 271.   After the plaintiff makes this showing, the defendant "may 'avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity.'" Id. (quoting Stephens v. Kerrigan, 122 F.3d 171, 176 (3d Cir. 1997)).

        In this case, Defendants concede that Plaintiff's position did not require political affiliation; therefore, the first prong has been met. (Defs.' Br. 11.)  Plaintiff has also satisfied the second prong because he claims Defendants retaliated against him because he supported Choi's opponent in the mayoral elections.  See Galli, 490 F.3d at 272 ("a plaintiff can meet the second prong of a *prima facie* political discrimination claim if she suffers because of active support for a losing candidate within the same political party.").

        However, Plaintiff has failed to satisfy the third prong.  As support for his contention that his political affiliation motivated Defendants' conduct, Plaintiff states that Choi made derogatory comments to Plaintiff's subordinates and told them that Plaintiff's support of Spadoro "was

being held against him." (Pl.'s Counterstatement of Facts ¶ 16.) This assertion is not supported by any evidence. Plaintiff points to an internal grievance he filed against Choi to support his contention, (Pl.'s Br. Ex. 8); however, the grievance makes no mention of any comments pertaining to Plaintiff's support of Sparodo "being held against him." (Id.) Additionally, the only "derogatory comment" in that grievance is about Choi allegedly telling a subordinate that Plaintiff is "incompetent." (Id.) To overcome a motion for summary judgment Plaintiff may not rest upon the mere allegations, speculation, unsupported assertions or denials of its pleadings. Shields v. Zuccarini, 254 F.3d at 481; see also Davis v. Ashcroft, 2002 U.S. Dist. Lexis 9309, * at 54 (D.N.J. Mar. 8, 2002) (stating that "unsupported assumptions are wholly insufficient for [p]laintiff to withstand a motion for summary judgment."). Cf. Perez v. Cucci, 725 F. Supp. 209, 219 (D.N.J. 1989) (finding that plaintiff made a *prima facie* case for retaliation based on political patronage after presenting testimony of other officers that defendant's supporters stated they were "'trying to get certain people that supported Cucci to get certain spots,' 'going to get those guys that are going against us,'" and plaintiff "would be walking the beat by the river.").

Furthermore, Plaintiff contends that his argument with Choi at the Event in 2007 is further proof that Defendants retaliated against him because of his political patronage. (Pl.'s Br. 25.) This argument has no merit. Plaintiff admits that he should not have ordered the officer to break up the campaign because it was occurring outside the Center and thus, the participants had a right to be there. As a result, Choi had a legitimate basis for directing Plaintiff not to allow any officers to come to the Center, and Plaintiff has failed to demonstrate that Choi's conduct was politically motivated. Similarly, this incident cannot form the basis of a retaliation claim because Plaintiff made those statements while performing his official duties; therefore, he was

not speaking as a private citizen for purposes of the First Amendment and his speech was not insulated from employer discipline.  Garcetti, 547 U.S. at 418.

Also, Plaintiff's argument that Choi's appointment of Ron Gerba ("Gerba") to chief of police supports his retaliation claim, (Pl.'s Br. 26), lacks merit.  According to Plaintiff, the appointment was "exceedingly suspect" because it violated the Township's ordinance.  This is inaccurate.  As stated earlier, the ordinance, even before its amendment, did not require that the senior deputy chief be made acting chief.  The ordinance merely required that "[a]ny individual, officer or candidate to be promoted to the position of chief of police or deputy chief shall have served in the position of captain of the police department for a term of no less than two years." (Pl.'s Br. Ex. 12 at 99.)  Plaintiff does not contend that Gerba did not have the requisite two years. There is no ordinance in the record before this Court that required Plaintiff to be appointed chief of police.  Additionally, Plaintiff admitted that Gerba was his senior because he had more time on the force.  (Defs.' Br. Ex. B, Vaticano Dep.,15:16-23.)  Furthermore, if Choi was making promotional decisions based on political patronage, he would not have promoted Gerba to chief of police as the latter had been an avid supporter of Bill Stephens, another opponent of Choi. See Wheeler, 2008 U.S. Dist. LEXIS, * at 9.

Moreover, Defendants have provided legitimate reasons to support their conduct.  For example, as stated earlier, Plaintiff was not promoted to chief of police because Collier had some valid concerns about his ability to lead because he was one of the leaders in the police department at the time the department was considered to be in "crisis."  Also, Collier asserts that the person in charge of COMPSTAT in Newark was a deputy chief; therefore, he thought it was best to send a deputy chief.  (Defs.' Br. Ex. Q, Collier Dep., 77:1-4.)  Furthermore, Defendants maintain that Plaintiff was assigned two weeks of midnight shifts due to some troubling incidents

17

which occurred.   (Defs. Br. 18.)   Plaintiff does not dispute Defendants' assertion that the midnight tour lacked supervision, as evidenced by the missing police vehicle and the "jacked up" car, and needed to be supervised by a higher ranked officer.

Although Plaintiff argues that he was given duties usually reserved for lower ranked officers, he remained a deputy chief and his compensation did not change.[8]   As the Third Circuit noted in <u>Clark v. Falls</u>, 890 F.2d 611, 617 (3d Cir. 1989) (internal quotations omitted) a change in duties is not a "reduc[tion] in rank."   Furthermore, Plaintiff initially responded positively to his assignment to the Bureau and stated he was "going to crack the whip down there . . . ." (Defs.' Br. Ex. B, Vaticano Dep., 150:15-16).   Also, the subsequent relocation of Plaintiff's office to the basement does not support his claim because the Bureau has always been located in the basement, (Defs.' Br. Ex. F, Bryan Dep., 72:4-11), and the previous supervisor's office was there, as well.   (<u>Id.</u> at 72:1-9.)   In sum, Plaintiff was not singled out.   Overall, Plaintiff has not provided any competent evidence to show that Defendants' reasons are pretextual.

## II.   Due Process Violation

Pursuant to the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law . . . ."   U.S. Const. amend. XIV.   To establish a claim for substantive due process under § 1983 for deprivation of property, "a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies."   <u>Am. Marine Rail NJ, LLC v. City of Bayonne</u>, 289 F. Supp. 2d

---

[8] Plaintiff did not receive a pay raise and tuition reimbursement, as required, after he was promoted to deputy chief. (Defs.' Br. Ex. B, Vaticano Dep., 168:5-12.)  However, Plaintiff admits that is the result of the administration's misinterpreted reading of his employment contract.  (<u>Id.</u> at 193:3-4.)  On March 3, 2008, prior to Plaintiff initiating this suit, the Business Administrator requested that Plaintiff come in to update his contract so that he could receive the appropriate pay raise and tuition reimbursement, but Plaintiff declined the invitation pursuant to his attorney's advice.  (Defs.' Statement of Facts  ¶¶ 134-135.)

569, 581 (D.N.J. 2003) (quoting <u>Woodwind Estates, Ltd. v. Gretkowski</u>, 205 F.3d 118, 123 (3d Cir. 2000)).  In order "to have a property interest in a benefit that is protected by . . . due process, 'a person clearly must have more than an abstract need or desire for it.  He[/she] must have more than a unilateral expectation of it. He[/she] must, instead, have a legitimate claim or entitlement to it."  <u>Robb v. City of Phila.</u>, 733 F.2d 286, 292 (3d Cir. 1984) (quoting <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 577 (1972)); <u>see also</u> <u>Pollock</u>, 968 F. Supp. at 190.  Such rights are usually created "by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  <u>Robb</u>, 733 F.2d at 292.

In this case, Plaintiff avers that he was entitled to the position of chief of police pursuant to an ordinance.  (Pl.'s Opp. Br. 34).  According to Plaintiff, the ordinance, subsequent to its amendment, provided that he was to be appointed chief of police.  However, this argument lacks merit.  Prior to its amendment, the ordinance stated: "[a]ny individual, officer or candidate to be promoted to the position of chief of police or deputy chief shall have served in the position of captain of the police department for a term of no less than two years."  (Pl.'s Br. Ex. 12 at 99.) Contrary to Plaintiff's position, this provision does not entitle him to be promoted to chief of police.  Rather, it merely articulates one of the requirements necessary for that promotion to be made.  In this case, Collier had the right to use his discretionary power to select an appointee that he thought would meet the department's needs.  Furthermore, he articulated legitimate reasons for not promoting Plaintiff.  Moreover, that ordinance was duly amended by a majority of the Township's council; thus, Plaintiff cannot use it as a basis to show entitlement.  (Defs.' Statement of Facts ¶¶ 106, 107, 110.)  Other than the ordinance, Plaintiff does not point to any state law or regulation mandating his promotion to chief of police.  Here, as in <u>Robb</u>, 733 F.2d at

19

293, the promotion at issue was "neither a matter of right nor . . . promised;" hence, Defendants' failure to promote Plaintiff does not support a cognizable due process claim under § 1983.  <u>See also</u> <u>Newark Branch, NAACP v. Harrison</u>, 940 F.2d 792, 811 (3d Cir. 1991) (concluding that there is no property interest in a promotion); <u>United States v. City of Chicago</u>, 869 F.2d 1033, 1038 (7th Cir. 1989) ("an officer has no entitlement to a particular roster position or to promotion.");  <u>Burns v. Sullivan</u>, 619 F.2d 99, 104 (1st Cir. 1980), <u>cert. denied</u>, 449 U.S. 893 (1980) (no property interest in promotion if it is based, in part, on discretionary decisions of officials); <u>Pollock</u>, 968 F. Supp. at 190 ("[p]laintiff cannot claim any legitimate entitlement to a promotion of deputy chief of police.").  <u>But see</u> <u>Carter v. Philadelphia</u>, 989 F.2d 117, 123 (3d Cir. 1993) (finding that there was a property interest in a promotional list because a state statute conferred such an interest).

Nonetheless, Plaintiff asserts Choi changed the ordinance to benefit his political supporters.  (Pl.'s Opp. Br. 35.)  However, the record indicates that it was the Township's council who changed the ordinance.  Plaintiff does not contest the record, nor does he suggest that the council had no authority to make amendments.  Furthermore, there is no evidence showing that the ordinance relating to the chief of police position was the only one amended or that the amendment was done specifically to deny him a promotion.  Additionally, the selected chief of police, Bryan, testified that he supported a Choi opponent, Spadoro, in the mayoral elections.  (Defs.' Statement of Facts ¶ 20; Pl.'s Br. Ex. F, Bryan Dep., 18:5-20.)  Thus, Plaintiff fails to make a showing that the amendment was politically motivated.

Furthermore, even though Plaintiff asserts that Bryan's promotion was in violation of the ordinance, he has failed to file an action in lieu of prerogative writs in the Superior Court of New Jersey under R. 4:69-6 which provides that "[n]o action in lieu of prerogative writs shall be

commenced later than 45 days after the accrual of the right to the review, hearing or relief claimed, except as provided by paragraph (b) of this rule."  Plaintiff was obligated to follow R. 4:69-6 because a township's personnel decision is not an exception under paragraph (b). Yet he did not do so after Bryan was promoted.  Hence, this Court has no jurisdiction to hear a challenge to a promotion based on an alleged violation of an ordinance.

### III.    Age Discrimination

To assert a claim of age discrimination under N.J. Stat. Ann. 10:5-1 et seq., the employee must show that age played a role in the employer's decision and that it had a determinative influence on that decision.  Bergen Commercial Bank v. Sisler, 157 N.J. 188, 207 (1999); see also Martinez v. Nat'l Broad. Co., 877 F. Supp. 219, 228 (D.N.J. 1994) (holding that employee need not prove that age was the sole reason for the adverse employment action, only that age was a determinative factor in the defendant's decision).  In essence, the employee has to show that "(1) she was a member of a protected group; (2) her job performance met the 'employer's legitimate expectations;' (3) she was terminated; and (4) the employer replaced, or sought to replace, her.  Nini v. Mercer Cnty. Cmty. Coll., 406 N.J. Super. 547, 554 (App. Div. 2009), aff'd, 202 N.J. 98 (2010) (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450 (2005)).

While discrimination must be intentional, the employee may prove the employer's intent to discriminate by either direct or indirect circumstantial evidence.  Greenberg v. Camden Cnty. Vocational & Technical Schs., 310 N.J. Super. 189, 198 (App. Div. 1998)  Should an employee choose to prove discrimination by direct evidence, the evidence needed to survive a motion for summary judgment is that "which if believed, proves [the] existence of [a] fact in issue without inference or presumption."  Bergen Commercial Bank, 157 N.J. at 208 (internal quotation omitted).  On the other hand, an employee may prove an employer's discriminatory intent with

circumstantial evidence through the burden-shifting framework provided by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). [9]  The McDonnell Douglas framework, which is a three step process, requires the plaintiff to establish a *prima facie* case of discrimination using the four elements enunciated above.  Bergen Commercial Bank, 157 N.J. at 208.  Proving a *prima facie* case creates a presumption of unlawful discrimination, which the employer can rebut by providing "admissible evidence of a legitimate, non-discriminatory reason for its rejection of the employee."  Id. at 211.  If the employer is able to meet this burden, the presumption disappears and the "burden of production then shifts back to the employee, who has 'the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination.'"  Id. (quoting  Andersen v. Exxon Co., 89 N.J. 483, 493 (1982)).  "Although the burden of production shifts throughout the process, the employee at all phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination."  Bergen Commercial Bank, 157 N.J. at 211.

Here, Defendants concede that the first element has been satisfied because Plaintiff is older than Bryan.  (Defs.' Br. 25.)  However, they correctly assert that Plaintiff is unable to meet the second, third or fourth prongs of the test.  Collier's performance evaluation of Plaintiff shows that Plaintiff's performance did not meet Collier's "legitimate expectations."  Nini, 406 N.J. Super. at 553.  Collier characterized Vaticano's work as "remarkably unimpressive . . . shallow and rudimentary."  (Defs.' Br. Ex. R.)  Additionally, he found that Plaintiff was "underperforming," (Id.) and that he lacked the necessary leadership skills.  (Defs.' Statement of

---

[9] The New Jersey Supreme Court has adopted the McDonnell Douglas approach "as the starting point" in analyzing claims under LAD.  Bergen Commercial Bank, 157 N.J. at 210 (citing Anderson, 89 N.J. at 492 (applying Title VII to a LAD claim alleging failure to hire a physically handicapped plaintiff)).

Facts ¶ 112.)   Plaintiff does not provide any evidence to counter Collier's assertions. Consequently, he has failed to meet the second prong of the test.  This Court need not address the last two prongs in light of Plaintiff's inability to establish the second prong.


**<u>CONCLUSION</u>**

For the reasons stated above, Defendants' Motion for Partial Summary Judgment is GRANTED.


**SO ORDERED.**

                                                       s/ Susan D. Wigenton
                                                       **Susan D. Wigenton, U.S.D.J.**


cc:  Madeline Cox Arleo, U.S.M.J.